5 ee 473

## Vassar and others vs. E. Camp and E. B. Camp.

It is a general rule that a bargain through the mail is closed when the party last agreeing binds himself by any appropriate paper deposited by him in the post office, properly addressed to the other contracting party. This rule applies, although the party executing the agreement declares, in effect, that he does not intend to be bound, until he receives an answer from the other party; with a duplicate of the contract executed by him.

The agreement, in such case, is perfected, so as to make it mutually obligatory upon the parties, when the duplicate, executed by the party to whom it was sent for execution, is deposited in the post office, addressed to the other party.

Where a party making a proposition to another, by mail, requires that if the same shall be accepted, speedy notice of the acceptance shall be given to him, it is a condition precedent to his being bound, that his offer should be promptly accepted and notice of acceptance given.

And where the previous correspondence has been conducted by mail, it is reasonable to presume—in the absence of any directions to the contrary—that notice is expected to be given through the same channel.

Giving notice by mail is depositing a letter, containing the requisite information, properly addressed, in the post office.

An agreement between the members of a copartnership firm, consisting of three persons, and four other parties, recited that it was proposed that each of the partners should upon the terms and conditions therein contained dispose of the equal undivided half of all his right, title and interest in the business and property of the firm to the parties of the second part, so that, upon performance of the terms of the agreement by the purchasers, each party should own an undivided interest in the business and property of the firm. It was then agreed that upon the fulfillment of the terms of the agreement, the firm should sell to the parties of the second part one half of the net profits of the business, for the term of five years, viz: to each of said parties one eighth part; such profits, however, over and above a specified sum annually, to be devoted to the purpose of paying for the shares of such parties in the capital. The firm covenanted that at the end of the term of five years, and upon the fulfillment of the conditions, they would convey to each of the parties of the second part the one equal, undivided eighth part of the property of the firm; provided the parties of the second part should each then pay to the former partners the value of one equal undivided eighth part of the property; in the meantime the title and possession of the property to remain in the former partners, and each party was to share in the profit and loss. *Held*, that the sharing in the profit and loss, with a right to use the capital, and an inchoate title to a portion thereof, constituted a full *partnership* between the parties, so as to render either of the parties an incompetent witness for the firm.

THIS was an appeal by the defendants from a judgment rendered against them at a special term of the court, on the verdict of a jury. The action was for a breach of a contract to furnish a quantity of barley to the plaintiffs. On the trial, at the Dutchess circuit in September, 1851, before Justice Barculo, the following letters, among others, were given in evidence.

"*Sackett's Harbor*, August 6, 1850.
Messrs. M. Vassar & Co.:

*Gentlemen*—The crop of barley in this county is much better than it was last season. We are conveniently situated for the purchase and shipment of Jefferson county barley, and if you wished to purchase in this section of the state, we could do it for you upon as reasonable terms as you could desire, or if you preferred contracting for its delivery at Poughkeepsie, we would do so at fair prices. Be pleased to give us your orders, and we will attend to them without delay. On account of securing the transportation at the present low rates, we deem it of advantage to make our arrangements as speedily as possible. We have generally been enabled to purchase barley in the early part of the season at lower rates than at a later period. The like result we have experienced as to transportation also. The barley of this county is this season unusually plump and good. We are decidedly of opinion that the first purchases will this season be the lowest, and transportation cheaper than if deferred much longer. Respectfully yours, E. & E. B. CAMP.

*Poughkeepsie*, Aug. 19, 1850.
Messrs. E. & E. B. Camp, Sackett's Harbor:

*Gent.*—Yours received under date of August 6th, but through the hurry of business and absence of junior partner, was omitted to be answered until the present. We thank you for information of barley crop and your offer to purchase for us, but as have the past two years bought largest portion of barley in Albany, on its arrival at which place can make selection, prefer thus to do this season; but if you wish to sell us five to ten thousand bushels of choice *two rowed barley* of this season's growth, clean, sound berry, weighing not less than 48 lbs. per

Vassar v. Camp.

bushel, deliverable between 1st and 20th Oct., please inform by return mail, or within one week after receipt of this, stating what will deliver for in city of Albany, cash on delivery, and will reply forthwith.     Yours,

      (Signed)     M. Vassar & Co.

          *Sackett's Harbor*, August 22, 1850.
Messrs. M. Vassar & Co.:

  *Gentlemen*—Your favor of the 19th inst. reached us this day. We will undertake to deliver you at Albany, between the 1st and 20th Oct. next, *from* 5000 *to* 10,000 *bushels* of first quality Jefferson county barley, of this year's growth, at 67½ cents per bushel, and weighing not less than 48 lbs. per bushel. *It being understood that if this offer shall be accepted, speedy notice of the same be given us.* Respectfully yours,

          E. & E. B. Camp.

        *Poughkeepsie*, August 26th, 1850.
Messrs. E. & E. B. Camp:

  *Gent.*—Yours of the 22d inst. is before us, and in reply we accept of your offer for ten thousand bushels Jefferson county barley, and herewith enclose a contract for the same, signed by us, with duplicate; the latter will execute and return by the next mail.

  In making this contract, we would remark that we have seldom been the gainers by buying our barley out of the Albany market, and had pretty much concluded never to look beyond that point for our supply for the future. In consultation, however, with our partners this morning, we have considered that inasmuch as you represent your barley of a superior quality this season, and your situation and conveniences well calculated for purchasing and shipping, &c., we have concluded to make this beginning with your house, in hopes it may result to our mutual advantage, and lead to further operations between us. Our yearly purchase is about 70,000 bushels, one half of which we buy of the two rowed kind, the other four rowed.

      (Signed)     M. Vassar & Co.

  A contract was enclosed in this letter, for the delivery of ten

thousand bushels first quality Jefferson county "*two rowed* barley."

           *Sackett's Harbor*, August 30th, 1850.

Messrs. M. Vassar & Co.:

     *Gentlemen*—Your favor of the 26th instant reached us this day. By reference to our proposal you will perceive that it was not restricted to any one particular kind of barley, except "first quality Jefferson county barley." There is probably more two rowed barley raised in this county than in any other in the state; but I have never known any quantity of barley raised here unless somewhat mixed with four or six rowed. It would therefore be impossible for us or any other persons to furnish you from hence even 1000 bushels of two rowed barley that would be free from some admixture of other kinds, and even a little sprinkling of oats. We have therefore enclosed the contracts you sent us, and sent you others, with our signature and a duplicate for you to sign and send us. We have extended the period of delivery to the 30th October, as there will be at least ten days' delay from the date of your letter before we can receive and act upon your reply. *As soon as received,* we shall send amongst the farmers and secure the first lots, even at an extra price, and when not threshed out, shall caution them against breaking the barley as little as possible.

        Respectfully yours,        E. & E. B. CAMP.

          *Poughkeepsie,* September 4th, 1850.

E. & E. B. Camp:

     Yours of the 30th ultimo, enclosing contract for ten thousand bushels of barley, was received this morning, and herewith return the duplicate signed by us. Your corrections in regard to its being purely of the 2 rowed kind was perfectly right, although in our letter of the 26th inst., it did not occur to us that your county raised any other kind of barley, to any very considerable extent. We have no objection to receiving either kind, provided it has been grown together; but if it comes separately, we expect you will keep it apart, it being quite difficult to malt it when mixed, grown on different farms, &c. &c.

       (Signed           M. VASSAR & Co.

Vassar v. Camp.

The contracts enclosed by the defendants, in their letter of August 30th, were as follows :· " Sackett's Harbor, August 30th, 1850. For and in consideration of one dollar to us in hand paid by M. Vassar & Co., the receipt whereof is hereby acknowledged, we hereby agree to deliver them, in the city of Albany, on or before the 30th day of October next, ten thousand bushels of first quality Jefferson county barley, of this year's growth, to weigh forty-eight pounds to the bushel, at sixty-seven and a half cents per bushel, to be paid on and when each boat shall be delivered at Albany, the expense of measuring to be divided as usual." This was signed by the defendants ; and the following counterpart was intended to be signed by the plaintiffs : " Pough-keepsie, August 30th, 1850. For and in consideration of one dollar to us in hand paid by E. & E. B. Camp, of Sackett's Harbor, New-York, we hereby agree to receive from them in the city of Albany, on or before the 30th of October next, ten thousand bushels of first quality of Jefferson county barley, of the growth of this year, to weigh forty-eight pounds to the bushel, at the rate of 67½ cts. per bushel, to be paid for on the delivery of each boat load, each party to pay half the measuring." The plaintiffs' counsel called *Oliver H. Booth* as a witness. The defendants' counsel objected to the witness on the ground of incompetency, by reason of his being a member of the firm of M. Vassar & Co., on and after 2d of September, 1850, and therefore a party to the contract, if one existed, and a necessary party to the suit. He attempted to show the witness' interest, as follows : By an agreement bearing date Sept. 2, 1850, between the plaintiffs of the first part, and James Vassar, Oliver H. Booth, James V. Harbottle and Alfred R. Booth, it was recited that the plaintiffs had previous thereto been partners in the brewing business, at Poughkeepsie, under the firm of " M. Vassar & Co.," and as such partners had been and were the owners of certain real estate and fixtures of the value of $108,339, and of personal property to the amount of $91,661 ; and that it was proposed that each of the former partners should, upon the terms and conditions therein contained, dispose of the equal undivided half of all his right, title and interest in said business and the property

before mentioned, to the parties of the second part, so that upon the complete and perfect fulfillment of the terms and conditions of such agreement, the parties should own and hold and have each an undivided interest in said business and the property thereto appertaining, as follows, viz : Matthew Vassar two undivided eighth parts, and Matthew Vassar, jun., John G. Vassar, James Vassar, Oliver H. Booth, James V. Harbottle and Alfred R. Booth, each one undivided eighth part thereof. It was then agreed that, *upon the fulfillment of the terms and conditions* thereinafter contained, the parties of the first part did thereby sell to the parties of the second part, their executors and administrators, share and share alike, the one-half part of the net emoluments, profits and increase of the business for the term of five years from the date thereof, viz. to each of said parties of the second part one-eighth part. Provided always, that all such net emoluments, profits and increase, over and above the sum thereinafter limited, should be devoted to the sole use and purpose thereinafter set forth. And the parties of the first part covenanted and agreed that at the expiration of the five years, and upon the complete fulfillment of all the covenants and conditions fixed in said agreement, they would convey and confirm unto each of the parties of the second part the one equal undivided eighth part of the real and personal estate before mentioned, as well as such other property as should, within said period, have been purchased by the profits and earnings of the business. Provided always, and the agreement was upon the sole condition that the parties of the second part should, at the expiration of the said term, pay to the party of the first part each the one equal undivided eighth part of the property, viz. the sum of $13,542,37 for his eighth part of the real estate, and the sum of $11,457,62 for his eighth part of the personal property, with interest. And for the better securing the said payment, the parties of the second part, and each party for himself, covenanted and agreed that he would not, during said term, by any method or in any manner, draw out from said business over $1000 per annum in any year; and that all the remaining profits and increase should be applied by each of the parties of the second

part towards the payment of his eighth part of the property, until each party should have paid in full for his share. It was further provided that neither of the parties of the second part should have any interest whatever in said personal or real property, at any time, further than he had paid for the same, and that the possession, right of property and fee should all remain in the parties of the first part, until said payments were fully made. In case of the death of either of the parties, during the five years, the survivors were to take his share at a valuation. It was also mutually covenanted and agreed, that neither party should in any manner charge his share or interest in the business, or incur any debt or liability by indorsement or otherwise; and that so much of the business as related to bank deposits, drawing and making drafts, &c. and in general all the pecuniary management of the business, should be and remain with the parties of the first part. Books were to be kept by the firm, to which each of the parties was to have access. The business was to be conducted, as before, in the name, style and firm of "M. Vassar & Co." The agreement contained some other provisions, not necessary to be mentioned.

The court decided that the witness, Booth, was competent, notwithstanding the above agreement; and the defendants excepted to the ruling. The witness then testified, that on the 30th of August, 1850, the plaintiffs, only, constituted the firm of M. Vassar & Co., and that the witness was their clerk. On the 4th of September, 1850, he took from the post office in Poughkeepsie the letter of the defendants, of the 30th of August, containing their contract and the counterpart. Matthew Vassar, in the firm name, the same day, executed the counterpart, and enclosed it in a letter directed to the defendants at Sackett's Harbor, which letter this witness the same evening deposited in the post office in Poughkeepsie. On the 4th September, this witness and James Vassar, Alfred R. Booth and James V. Harbottle, were interested in the firm of M. Vassar & Co., by virtue of a written agreement; but they had no interest in this contract or any others, except those enumerated in said written agreement. That agreement was actually executed late in the after-

noon of the 5th of September, 1850, although it is dated the 2d September. This Camp contract was spoken of by the parties when the agreement was executed, and this witness and the others concluded not to take it, and the plaintiffs kept it. The plaintiffs' counsel then proved by *Alson Ostrander*, a clerk in the Poughkeepsie post office at the time, that on the 5th of September, 1850, one letter was sent from that office to Sackett's Harbor, and that one was an unpaid letter, and that no other went from the Poughkeepsie office to the Sackett's Harbor office on that day or for some days before or after that date. A letter left in the office the afternoon or evening of the 4th, would regularly have been mailed the 5th September. The plaintiffs' counsel then proved by *Orange H. Harris*, postmaster at Sackett's Harbor, in September, 1850, that as appeared by his books, on the 7th of that month, but one letter reached his office from Poughkeepsie, and that was mailed the 5th, and was unpaid. This was the only letter received from Poughkeepsie for some days before and after, and was in the ordinary course of mail. The defendants received their letters from the office of this witness, and for their convenience had a private drawer with a key which they kept, and to which they always had access from the outside, and into which all their correspondence was placed; letters belonging to the boxes and drawers were always deposited in them immediately upon the receipt of a mail. Witness had no specific recollection of this particular letter. George H. Camp, a son of one of the defendants, Mr. Stuart, defendants' clerk, frequently came for defendant's letters, and sometimes Geo. H. Camp's little daughters came. No notice was taken of the persons who came for the defendants' letters, as they helped themselves. The plaintiffs further proved by *Wm. H. Dickey*, that he was the only clerk in the post office at Sackett's Harbor in September, 1850. An unpaid letter mailed in Poughkeepsie the 5th of that month was received at Sackett's Harbor the 7th. This witness made the entry of its receipt; the letters always were placed at once in the proper boxes and drawers. The plaintiffs proved by *William Lacy* and *Matthew T. Hallinbeck*, barley dealers in Albany, that on and about the 30th October,

1850, barley was worth from 85 to 91 cents per bushel at that place. The defendants' counsel then moved for a nonsuit, on the grounds, 1st. Of a want of proper parties to the action; 2d. A want of evidence of the delivery of the contract. This motion was overruled by the court, and the defendants' counsel excepted.

The defendants' counsel then proved by *Samuel Y. Hooker,* a grain dealer in Sackett's Harbor, that he had bought barley for years at Sackett's Harbor; that he bought fifty thousand bushels and over in 1850; that before the 15th September he paid fifty cents per bushel; that if Col. Camp had had the contract before the 20th of September, it would have cleared over all expenses five hundred dollars.

The judge charged the jury that the main question in the case was, as to the existence of a contract. There was no dispute as to its breach, if one existed, and little as to damages. The jury would therefore find the following facts: *First.* Did the plaintiffs send the defendants the counterpart of the contract executed on or about the 4th of September, 1850? *Second.* Did that counterpart arrive at Sackett's Harbor, and was it put in the defendants' box or drawer? *Third.* Did that counterpart reach the defendants? *Fourth.* The value of barley at Albany on the 30th October, 1850. Whereupon the following written verdict was found by the jury: *First.* That a letter from the plaintiffs, containing a counterpart of the contract set forth in the pleadings, was deposited in the post office at Poughkeepsie, on the 4th of September, 1850, directed to the defendants at Sackett's Harbor. *Second.* That said letter containing said counterpart was transmitted to the post office at Sackett's Harbor, and was deposited in the box or drawer of the defendants by the postmaster or his clerk, on or about the 7th of September, 1850. *Third.* That they had not sufficient evidence that the defendants received the letter from the box in the post office at Sackett's Harbor. *Fourth.* That the market price of barley at Albany, on the 30th October, 1850, was 87½ cents per bushel.

And thereupon the justice ordered and adjudged that the plaintiffs recover against the defendants the sum of $2000 dam-

ages; and that the plaintiffs be allowed five per cent on that sum, amounting to $1.00, by way of additional costs.

*J. A. Spencer,* for the appellants. I. The motion for judgment of nonsuit should have prevailed, on the ground of the want of parties plaintiffs. The articles of copartnership of the new firm bear date the 2d of September, 1850; and although not signed until the 5th, yet when signed, the execution, by relation, made the parties to it partners from the date. The articles recite that the old firm had been partners " up to the date hereof." The second article says that the old firm " were and are, at the date hereof," the sole owners of certain personal property, the value of which, " at the date hereof," was fixed at $91,661. The third article proposes to sell certain shares " in the business and property herein above described and referred to." The articles provide for the sale and conveyance to the incoming partners " one half part of the net emoluments, profits and increase of the business aforesaid, for the term and period of five years from the date hereof." Also for the conveyance to them of their shares of the real estate and personal property specified in a schedule, " and also all such other real or personal property or effects as may, within said period, have been purchased by the profits and earnings of said business, between the day of the date of these presents and the expiration of the term aforesaid." " The business shall continue to be conducted during said term as heretofore, in the name, style and firm of M. Vassar & Co." The whole agreement shows the term of the new partnership to commence at the date of the articles, and to continue for five years from that date. Oliver H. Booth testifies that he, James Vassar, Alfred R. Booth and James V. Harbottle were interested in the firm of M. Vassar & Co. on the 4th September, 1850, by virtue of a written agreement. This testimony shows that the new partnership commenced on the 2d Sept. and before there is any pretense of a contract with the defendants. From that moment " M. Vassar & Co." embraced every member of the new firm and made all subsequent agreements with other parties their agreements. What Booth says about the " Camp contract" has

no legal force to change the rights of the defendants. It is true that the written agreement operated upon the subjects of it as mentioned therein, but it also made every contract and operation subsequent, the contract and operation of the new firm. The rights and liabilities of the parties in relation to all matters, both before and after the date of the agreement, depend on the agreement in writing. These rights and liabilities cannot be changed by verbal conversations. An agreement cannot exist partly by writing and partly in parol. No agreement with the Camps existed when the new firm commenced business. The old firm had made none. The new firm did make it, if made. Even if the verbal conversation as between the members of the firm had any force as between themselves, (which is denied,) it had no effect or influence upon the rights of the defendants. If the contract was complete on the 4th September, the defendants could maintain a suit upon it against the new firm for the price of the barley, had it been delivered. II. There never was any contract made by the defendants, either with the old or new firm. (1.) The correspondence is to be looked to, to ascertain what agreement was proposed to be made by the parties. The defendants were not the owners of the barley, but proposed to purchase for the plaintiffs' supply. (2.) The defendants' letter of the 30th Aug. 1850, and the proposed contract enclosed in it, form the agreement between the parties, as proposed by the defendants. It is the same as if it had been written in the proposed agreement, that the defendants, "as soon as the plaintiffs' acceptance was received by them, they would act upon it and commence making purchases." It was one of the conditions which the defendants had a right to prescribe, that the mere acceptance by the plaintiffs at Poughkeepsie should not bind them, but that they would be bound only from the time the plaintiffs' acceptance was received at Sackett's Harbor. The plaintiffs accepted it with this condition annexed. The defendants had a right to provide, and did provide, against accidents attending correspondence. The defendants' letter of the 22d August, 1850, shows that they required speedy notice of the acceptance of their offer to be given them. Not when accepted at Poughkeepsie by the plaintiffs,

---

Vassar *v.* Camp.

---

but on the receipt of notice of such acceptance by the defendants at Sackett's Harbor, to be speedily given, would they be bound. The required notice of acceptance the jury have found the defendants never did receive. That they never had any knowledge that the plaintiffs had accepted their offer. The proposal therefore never became a contract. The plaintiffs agreed by their letter of the 4th of September to accept the proposal subject to this qualification. They could not accept it in any other form, without making their acceptance a new proposal. The plaintiffs therefore agreed to take the risk of accidents, and agreed upon the time when the defendants should be bound by their agreement. Suppose the general rule to be that the deposit of the letter in the post office, containing the acceptance of the proposal, closed the agreement, it was perfectly competent for the defendants to make an agreement out of this general rule, and prescribe terms that they could not be bound until informed of the plaintiffs' acceptance at Sackett's Harbor. This they did do expressly by their letters, and the case shows the precaution to have been eminently proper. (*Chit. on Cont.* 13, 14, 5*th Am. from* 3*d Lond. ed. McCollough* v. *Eagle Ins. Co.,* 1 *Pick.* 278. *Elison* v. *Henshaw,* 4 *Wheat.* 225. *Frith* v. *Lawrence,* 1 *Paige,* 434, 442.) III. The circumstance that the jury have found that the letter came into the defendants' box is really of no moment. The box was open and accessible to every one from within the post office. It does not prove it was not lost, mislaid, or mis-delivered. And the jury have found that it was never rightfully delivered to the defendants. IV. The plaintiffs' counsel put the defendants' letters in evidence. These must be taken to be true until disproved. There is not a word of evidence to disprove them, but they are fully confirmed by the testimony. The whole case shows that the defendants understood and acted upon the matter as we insist the law is, and as they understood their duties and rights to be. They waited anxiously for the knowledge they required of the plaintiffs' acceptance, with all things ready and waiting to fulfill their agreement as soon as they should know it had become one. They lost an opportunity to make over $500 profits, and yet the

plaintiffs demand $2000 more for failure of their profits. Such injustice should not be allowed.

*C. Swan,* for the respondents. I. The contract in question was made prior to the agreement between the plaintiffs, the Booths, James Vassar and Harbottle. It was made complete the 26th August; at all events on the 30th: for the moment the defendants committed their proposition to the mail, they had lost their power over it, and could not have countermanded it. (*Story on Cont. pp.* 269, 297, 302. *Mactier* v. *Frith,* 6 *Wend.* 103, 115, 116, 119, 120, 147, 155. 4 *Paige,* 20.) When accepted, its acceptance made the contract relate back as of the day of its proposal by the defendants. They made the contract the 30th of August, irrevocably. No delivery of the counterpart of the 30th of August, back from the plaintiffs to the defendants, was requisite. It had already been accepted, and the defendants notified. But the counterpart of the letter of the 30th August was delivered to the defendants. The defendants chose the mail as their agent, and took the risk. A delivery to the mail was therefore a delivery to them. At all events, a delivery into their drawer at the post office was such to them. (*See above authorities.*) II. There is no evidence of a partnership between the plaintiffs, Booths and Harbottle, either inter sese, or as to third persons. The agreement of the 5th of September makes no community of stock. (*Story on Part. 2d ed.* § 27. *Dob* v. *Halsey,* 16 *John.* 34. 3 *Kent's Com. 4th ed.* § 43, *p.* 24.) No community of profits and loss. (*Story on Part.* § 32, *note* 3, § 33.) No mutuality of powers and duties. (*Id.* §§ 36 *to* 39, 47, 48. 20 *Wend.* 70.) III. If there was such a partnership, it was subsequent to the contract on which this suit is founded, and did not pass it over, or require all the parties to unite to sue, nor did it disqualify Booth. (*Code,* §§ 111, [91,] 398, [351.] This contract was expressly excepted from the operation of the agreement. IV. The third fact found by the jury is superfluous. Mailing the acceptance made the contract complete. At all events, the delivery of it to the private drawer of the defendants was an actual delivery to them. Its reception

by the defendants was at the defendants' risk the moment it was in the mail. Indeed the mailing itself by the plaintiffs was a legal reception by the defendants. (*See point I. above, and authorities.*) The jury evidently intended, in the third point found by them, to say there was not sufficient evidence for them *to find as a fact*, that the defendants personally, actually received in their hands the letter of the 4th of September, leaving it to be determined by the rule of law, whether, under the circumstances, a delivery into the mail at Poughkeepsie, and into the defendants' drawer at, Sackett's Harbor, was or was not a delivery to them.

*By the Court*, S. B. STRONG, J. The contract was I think perfected, so as to make it mutually obligatory upon the parties, when the duplicate executed by M. Vassar & Co., was deposited in the post office at Poughkeepsie on the 4th of September, 1850. The final proposal by the defendants was made when they deposited their letter, enclosing the contract signed by them, in the post office, on the 30th of August. That proposal remained open and unchanged on the 4th of September, when it was accepted by the plaintiffs in the manner which I have indicated. The general proposition, that a bargain through the mail is closed when the party last agreeing binds himself by any appropriate paper deposited by him in the post office, properly addressed to the other contracting party, was admitted on the argument. It is based upon the principle, that an offer made by one party and accepted by the other constitutes the contract. The assenting minds of the parties then meet. The rule was ably discussed and definitively settled by the court for the correction of errors in *Mactier* v. *Frith*, (6 *Wend.* 103.)

But the counsel for the defendant contended on the argument that the rule does not apply to this case, as their letters declared in effect that they did not intend to be bound until they received an answer from the plaintiffs, with a duplicate of the contract executed by them. In the letter written by the defendants on the 26th of August they say, "it being understood that if this offer shall be accepted, speedy notice of the same be given

Vassar v. Camp.

to us." That undoubtedly made it a condition precedent to their being bound that their offer should be promply accepted; and it was so. It was also necessary that speedy notice of the acceptance should be given to the defendants. But the letter does not designate the manner in which the notice should be given; and as the previous correspondence had been conducted by mail, it was reasonable to suppose that it was intended that the notice should be given through the same channel. Now, what is giving notice by mail? undoubtedly, depositing a letter containing the requisite information, properly addressed, in the post office. The defendants' letter, as I understand it, required prompt action, but no more action than is necessary in ordinary cases. The notice was promptly given. Their counsel also relied upon a passage contained in their letter dated on the 30th of August, where they say in reference to an expected reply accepting their offer, "as soon as received we shall send amongst the farmers and secure the first lots" (of barley,) as indicating that they did not intend to be bound until such reply should be received. It seems to me, in reference to this, that the remark of the plaintiffs' counsel was right when he said that this passage merely indicated what the defendants intended to do in accordance with their contract, when they should ascertain that it had been perfected, and not the time when it should become obligatory upon them. Had they intended that their negotiation should differ from the ordinary rule as to the commencement of their obligation, they should have said so, in explicit language. If there is any doubt, it should upon the general principle be construed against the parties using the uncertain terms.

The next question is, whether the agreement between the plaintiffs, the Booths, James Vassar and Harbottle constituted a partnership between them. I am clear that it did. The agreement provided that each was to share in the profit and loss. All had a right to the use of the capital, and the profit of each was to be applied at the end of five years in the payment for *his* share of the capital at the existing appreciation, when he was to receive the legal title to it from the members

of the old firm. It seems to me that sharing in the profit and loss, with a right to use the capital, and an inchoate title to it, constituted a full partnership. In *Dob* v. *Halsey*, (16 *John.* 34,) it was decided that where one contributed, and was to retain the capital, and the other his services, and the net profits were to be shared, there was a partnership, not only as to third persons, but between the parties themselves. That case perhaps goes quite far enough; but it is undoubtedly right so far as it declares that there need not be a participation in the capital stock. Chancellor Kent says, (3 *Com.* 25,) "it would be a valid partnership, notwithstanding the whole capital was in the first instance advanced by one party, if the other contributed his time and skill to the business, and although his proportion of gain and loss was to be very unequal. It is sufficient that his interest in the profits be not intended as a mere substitute for a commission, or in lieu of brokerage, and that he be received into the association as a merchant, and not as an agent." In this case the shares of the incoming associates, in the profits, were not to be received by them as a compensation for their services, but as their portions of the profits of a business in which they were jointly interested, and they were also to be principals and not mere agents. They were therefore full partners.

When the contract on which this suit was brought was signed by M. Vassar & Co. and deposited in the post office, and thereby became operative, the firm consisted of the plaintiffs only. It was *then* their contract, and not that of the new partnership. The agreement by which the new society was constituted was signed the next day. The execution and (when that is requisite) delivery of a deed give it efficacy. Until then it is inoperative. That is the rule where a deed is requisite for the *consummation* of a transaction, as in transferring a title to real estate. It may not be strictly applicable to the institution of a partnership association. That may be formed by a verbal agreement, and then it dates from the time when the agreement was made. When there is a written agreement, the presumption is that the contract was made on the day when the agreement was ex-

Vassar *v.* Camp.

ecuted and (when a delivery is necessary) delivered. In this case there is nothing to evince that there was any definite contract anterior to the execution of the written agreement. The new partnership, when formed, was to refer back to the 2d of September, two days before the agreement on which this suit was brought was executed by M. Vassar & Co. That, however, does not make it out that the new firm was a contracting party with the defendants. It would merely show that as between the partners themselves the new associates would be interested in the performance of this contract if it was included in the retrospective matters referred to in the partnership agreement. Even then, however, it may be doubted whether the plaintiffs might not maintain a suit in their own names, for themselves and as trustees for their associates. (*Code of* 1851, § 113.) It is not necessary, however, to decide that question, as the partnership agreement does not in terms either refer to or include the contract between the parties to this suit; and Mr. Booth, one of the new associates, swears that it was not in fact included but was expressly excluded from the antecedent transactions of the old firm, in which the remaining parties were to be interested. It appears to me that the suit was rightly brought in the names of those only by whom and to whom the contract was made.

The objection to the admissibility of Mr. Booth as a witness was waived by the defendants' counsel on the argument.

The judgment rendered at the special term should be affirmed, and the motion for a new trial denied.

[DUTCHESS GENERAL TERM, October 4, 1852. *Barculo, Brown* and *S. B. Strong*, Justices.]