### George W. Hallock *vs.* The Commercial Insurance Company.

1. A variance between the pleading and proof is immaterial, unless the party is misled and prejudiced by it.

2. The acceptance of a proposal to insure for the premium offered, is the completion of the negotiation; and after the policy has been forwarded to the agent of the company for delivery, the contract cannot be rescinded without the consent of the party insured.

3. If the premium is tendered to the agent when application for insurance is made, and he does not receive it, but says he will consider it as paid, and authorizes the applicant to keep the money until the policy arrives, the contract will be as binding upon the company as if the money was *actually* paid over to the agent.

4. If an insurance company take a risk to commence previous to the date of the policy, and the property is destroyed before the policy is actually executed and delivered, where there is no fraud or concealment by the party insured, the company will be as much bound as if the loss occurred after the policy was delivered.

5. A contract arises when an overt act is done, intended to signify an acceptance of a proposition, whether such overt act comes to the knowledge

Hallock v. Insurance Co.

of the proposer or not ; and, unless a proposition is withdrawn, it is considered as pending until accepted or rejected, provided the answer is given in a reasonable time.

An action of trespass on the case was brought in this court by George W. Hallock against the Commercial Insurance Company.

The plaintiff declared on a policy of insurance, and the defendants pleaded the general issue. The case was tried at the Hudson Circuit, before a jury, at May Term, 1856.

By the evidence on the trial, it appeared that, during the month of March, eighteen hundred and fifty-five, and before and after that time, George W. Breck, of Bath, Steuben county, in the State of New York, was agent of the defendants, for the purposes hereinafter mentioned, who were an insurance company located at Jersey City, in this state ; that the said George W. Breck was authorized by the defendants to make surveys, receive proposals for insurance, and to receive premiums upon risks accepted by the company, but was not authorized to make insurances or issue policies ; the proposals for insurance made to him were sent by him to the company at Jersey City, and if accepted by the company, the policies were made out by them and sent to him to deliver.

While he was such agent, and about the second day of March, eighteen hundred and fifty-five, the plaintiff applied to him to insure his building, called Headquarters, situated in Bath, the insurance to be for twelve hundred dollars, and to commence on the tenth day of the same month, at noon, at which time a policy in another company, then in existence, would expire. Breck made a survey of his building, and told him what the premium would be. The plaintiff thereupon offered the premium to said Breck, who said he would consider it as paid, but would leave it with the plaintiff, who was a banker, and with whom he, the agent, kept an account, till the policy arrived, when he, Breck, would call and get the

money. The application annexed to the survey was signed by the plaintiff, and sent by said Breck to the company by mail, on the second or third day of March. The company deferred acting on the application until the thirteenth day of March, eighteen hundred and fifty-five, until the secretary of the company could procure a map of Bath, referred to by Breck; and on the thirteenth day of March, between ten and twelve o'clock A. M., a policy was filled up and signed, and mailed at Jersey City, directed to said Breck at Bath. By the regular course of mail, it should have arrived on the fourteenth of March, but owing to obstructions on the road by snow, it did not arrive until the sixteenth of March; and, at the same time, the said Breck received the following telegraphic dispatch, dated on the 15th of March A. M.: "Risk not taken when burnt—return policy when received."

Accompanying the policy was a letter from the secretary of the company, stating that the company had held the risk under advisement until they could procure a map of Bath, referred to in the agent's letter, and that they did not look upon the risk as a very desirable one, but, as the rate seemed a fair one, they enclosed a policy, relying very much upon the representation of the agent in regard to the good character of the occupant.

The plaintiff, on the sixteenth day of March, after the policy had arrived at Bath, tendered the premium in gold to said Breck, and demanded the policy; Breck, considering that the money had been in the plaintiff's hands as a deposit to his, Breck's credit, accepted it. By so doing, he meant to put the plaintiff in the same situation he would have been in if he had taken it on the second March, 1855; but refused to deliver the policy, because he was so directed by the defendants, and returned the policy, on the twenty-ninth, to the defendants, who canceled the signatures thereto, and marked the same "canceled," and otherwise, as will appear by the policy.

Hallock v. Insurance Co.

The building insured was destroyed by fire, which was communicated by the burning of the adjoining building not owned by or under the control of the plaintiff. The fire was on the morning of the thirteenth of March, and the building was wholly consumed before eight o'clock in the morning of that day, two hours before the policy was executed.

The building was the property of the plaintiff, was worth sixteen hundred dollars, and was a total loss. Proper notice of loss and preliminary proofs were furnished by the plaintiff to the defendants on the twenty-first day of March.

The agent never remitted the premium to the company, because they directed him to return the policy; and the company, when called upon, refused to pay the loss, on the ground that they had made no contract of insurance.

The plaintiff, at the trial, did not produce the original policy of insurance; but the same having been called for by the plaintiff, and previous notice having been given to the defendants to produce it, the same was produced by defendants. There was a variance between the policy set out in the declaration and schedule and the policy produced by the defendants, in the following particulars; the time of payment in the original policy was ninety days after loss, while that declared on was four months; and there was also a variance in the statement of the names of the officers who signed the policy.

On the trial below, the defendants insisted that the plaintiff ought not to recover—

1. Because the action should have been in trover, the policy being in the possession of the defendants, canceled.

2. Because there was a variance between the policy stated in declaration and schedule and the original policy in the possession of the defendants.

3. Because at the time of the fire, no policy was actu-

ally in existence, and no insurance at that time had been effected.

The court directed that a verdict should be taken for the plaintiff, with liberty to make a special case for the opinion of the Supreme Court, or turn it into a special verdict, at the instance of either party, within ninety days after the judgment of the Supreme Court should be rendered and entered.

The cause was argued at February Term, 1857, before the CHIEF JUSTICE, and Justices POTTS and VREDENBURGH.

*A. O. Zabriskie,* for the plaintiff.

*J. W. Scudder,* for the defendants.

VREDENBURGH, J. G. W. Breck was the agent of the defendants at Bath, New York, to make surveys, receive proposals for insurance, and receive premiums on risks accepted by the company, but was not authorized to make insurances or issue policies. The proposals for insurance were sent by him to the company at Jersey City, and if accepted by them, the policies were to be sent to him to deliver.

On the 2d of March, 1855, the plaintiff applied to him to insure his building in Bath, for one year from the 10th of March, for $1200. Breck made the survey, and told him what the premium would be. The plaintiff thereupon offered the premium to Breck, who said he would consider it as paid, but would leave it with the plaintiff, who was a banker and with whom he kept his account, until the policy arrived, when he would call and get the money. The application was signed by the plaintiff, and with the survey attached, was sent by Breck to the company, on the 2d or 3d of March. The defendants deferred acting on the application until the secretary could procure a map of Bath, referred to by Breck.

On the 13th of March, between ten and twelve A. M., the map having been received, a policy was filled up on said building, insuring it from the 10th of March for one year, signed by the proper officers, and mailed at Jersey City, directed to Breck at Bath, which by due course of mail would have reached him on the 14th of March, but which owing to the snow, did not until the 16th of March. At the same time that Breck received the policy he also received a telegraphic dispatch, dated the 15th March, as follows: " Risk not taken when burnt. Return policy when received."

Accompanying the policy was also a letter from the secretary, of the tenor following:

" Office of the Commercial Insurance Company, No. 3 Montgomery street, Jersey City, March 13th, 1855.

Messrs. Breck and Sawyer, Esq'rs, Bath, N. Y.

Dear sirs—Your application on G. W. Hallock's saloon has been held under advisement till we could procure a copy of the map, of which you speak in your letter. We do not look on it as a very desirable risk, but nevertheless, as the rate seems a fair one, we enclose a policy, relying very much on your representation in regard to the good character of the occupant. Enclosed please find policy, No. 1054, for $1200, premium, $24.

Respectfully,

J. M. CHAPMAN, Sec'y."

On the 16th March, after the policy arrived, the plaintiff tendered the premium in gold to Breck, and demanded the policy. Breck accepted the money, because he had refused to accept it when the application was made, and considered it on deposit, meaning to put the plaintiff in the same situation as if he had received it on the 2d of

March, but refused to deliver the policy, because so directed by the defendants.

The building insured was entirely consumed by fire on the 13th of March, at 8 A. M., about two hours before the risk was accepted or the policy signed. There was a variance between the policy declared on and the original, in the time of payment of the insurance and the name of the officers who signed the policy. The suit is on the policy, and the plea the general issue.

As to the variances, there is no proof, nor even any allegation, that the defendants were misled by them to their prejudice, and they must consequently, under the 43d section of the act of 1855, (*Nix. Dig.* 641) be deemed to be immaterial.

The defendants submit two other points, viz.:

First. That the policy is void, because when made the loss had already occurred ; second, that the policy never did become a contract of insurance.

As to the first point, the policy is not dated, but it was signed on the 13th of March, at noon. The fire happened about two hours before. The policy, by its express terms, insures the building from the 10th of March, 1855, at noon, to the 10th of March, 1856, at noon. There is raised no question of fraud, concealment, or misrepresentation.

So far as appears by the case, when the policy was signed both parties were equally ignorant of the fire ; even if the plaintiff knew, and the defendants were ignorant of it, it was so in both cases by a physical necessity. Or even if the plaintiff had known of it, and could have telegraphed it to the defendants in time to have reached them before they signed the policy, (neither of which appears) he was, in the circumstances then existing, under no legal or moral obligation so to do.

There can be no doubt but that the policy, in its terms, is precisely as both parties intended it should be. The application was for insurance from the 10th ; the defendants had held it under advisement from the 2d to the 13th,

thereby preventing the plaintiff from applying elsewhere, and then, by express terms, insured from the 10th for one year. They intentionally made the year's risk commence from the 10th. If the fire had occurred on the 13th March, 1856, instead of 1855, under this policy, the defendants could not have been held liable. When they filled up the policy, they elected to take the premium from the 10th. They took their pay for the very time during which the fire occurred, and thus say now, in effect, this is a very good policy from the 10th to the 13th, if no fire occurs, but a void one if there does. The question, therefore, is, is a contract to insure against fire from a time past, void in law.

No decision, or authority, or principle, sustaining such a doctrine has been referred to before us. It is every day's practice in both marine and fire insurance. A contract is good, unless shown to be against good morals or sound policy. I do not see how this contract contravenes either, or what difference in principle there can be between insuring from a time past and a time to come. Many cases will be found recognizing the validity of such contracts. *Lightbody* v. *The N. American Ins. Co.*, 23 *Wend.* 18; *Perkins* v. *Washington Ins. Co.*, 4 *Cow.* 645, 665; *Kohne* v. *The Ins. Co. of N. America*, 1 *Wash. C. C. R.* 93; 12 *Wheat.* 408; 20 *Barb.* 475.

*Secondly.* The defendants insist that the policy never did become a contract of insurance; that even if the fire had happened on the 14th of March, or at any time afterwards, no action could have been sustained upon it.

The defendants suggest three reasons why the policy never became a contract.

*First.* Because the premium never was paid.

*Second.* Because the application of the plaintiff cannot be considered as an existing offer when the policy was signed.

*Third.* Because the policy never was delivered.

Upon the first point it is insisted, in the first place,

that on the 2d of March, Breck was not the agent of the defendants to receive the premium; that he was such agent only after, and not before the risk had been accepted by the company; that the acceptance of the risk was a condition precedent to Breck's authority to receive the premium.

One of the conditions of the policy is, that no insurance shall be binding until payment. The premium must consequently be paid, either at or before the legal acceptance of the risk. The case, therefore, when it says that Breck was the agent of the company to receive the premium on risks accepted, cannot mean that he was not authorized to receive until after the risk was accepted; because if that were so, no insurance could ever be effected at all. When the case says Breck was the agent to receive premiums on risks accepted by the company, it can only mean that he was the agent to receive premiums, not absolutely, so as to bind the defendants to accept the risk, but conditionally, provided the risk should be accepted. The words "upon risks accepted" is applied in the same sense to the receipt of premiums as it is to the making of surveys and receiving proposals. Breck had no authority to insure, and the case, by the terms "risk accepted," meant to negative the idea that he could so receive premiums as to bind the company to accept the risk. Breck was authorized to receive the premium in the same way as the defendants themselves would receive it, with the proposals, before they had decided to take the risk, viz., on deposit and conditionally, so as to make the proposal perfect and so as to leave nothing further to be done by the applicant, and leaving nothing to be done by the defendants to perfect the contract but a simple election. If they elected not to accept the risk, the money was not theirs, it belonged, and must be returned to the applicant; but if they elected to accept, it *eo instanti* was rightfully in their possession, and became their property. As the defendants could receive the premium with the proposal, and as a

part of the proposal to await their election, so they could and did authorize Breck to receive the proposal and the premium to await the result, and the reception of the premium by Breck was the reception by them.

The defendants next insist, that if Breck was authorized to receive the premium on the 2d, yet that he did not in fact receive it until after countermand.

The case shows that the plaintiff, when he made his application, offered Breck the premium, who said he would consider it as paid, but would leave it with the plaintiff, who was his banker, till the policy arrived, when he would call and get it. Would it have made the payment more real if the plaintiff had handed Breck the money, and Breck had deposited it with his banker? The money was, in legal effect, paid to Breck, and by him placed in deposit. It was, in contemplation of law, an actual payment to the company, as much so as if Breck had transmitted the money, as well as the application, to the company. But if not an actual payment, the defendants are estopped from saying that it is not. They must be considered as doing what Breck did, viz., saying to the plaintiff, on the 2d of March, when he tendered them the money, we will consider it as paid. *N. York Central Ins. Co.* v. *National Protection Ins. Co.*, 20 *Barb.* 474.

*Secondly.* The defendants insist that the application having been made on the 2d of March, and no action having been taken by the defendants until the 13th, we cannot consider the plaintiff as still continuing his offer to the defendants; that we are bound to consider it as withdrawn. But why so? There is no pretence of any express withdrawal. The question and the answer can never, in any case, be simultaneous; the question must always remain for some length of time with the one to whom it is put, and abide the answer. In every negotiation, whether by telegraph, by letter, or by word of mouth, the application and the answer can never be at the same precise instant. The application must wait upon the

answer.   If the application is considered to be withdrawn as
soon as made, no two minds ever could meet upon any prop-
osition.   The *aggregatio mentium* never could take place.   In
all cases the application is construed to stand until the con-
trary appears; until. it is either withdrawn · or answered.
*Pothier Traite du Contrat du vente, p.* 1, § 2, *Art.* 3, *No.* 32;
*Mactier* v. *Frith;* 6 *Wend.* 103.

But here the plaintiff avers the application to be still
standing.   The defendants treat it as still before them on the
13th of March, by accepting it and making out the policy.
We must therefore treat it as the parties treat it, as still at
noon on the 13th of March a standing and valid offer by the
plaintiff to the defendants.

*Thirdly.*   The defendants contend that the policy never
was delivered, so as to make it a living contract.   But it
appears by· the case, that the contract to insure was com-
plete before they mailed the policy to Breck.   Their tele-
graphic dispatch, dated on the 15th of March, says, " risk
not taken when burnt ; return policy when received." This
necessarily implies that the risk was taken, but taken
after the fire.   Breck had no authority to insure.   *After*
the proposals were accepted by the company, they made
out the policies and sent them to Breck to deliver ; so
that it appears, by the case, that before they mailed the
policy to Breck they must have received the premium
and accepted the risk, and thus completed the contract to
insure.   If the case had gone no further, and ·no policy
had ever been made out, it is well settled that the plain-
tiff could have sued them upon this contract at law or
forced from them a policy in equity.   *Perkins* v. *Washing-
ton Ins. Co.,* 4 *Cow.* 660 ; *Hamilton* v. *Lycoming Ins. Co.,* 5
*Barr* 339 ; *Angell on Fire Ins.,* §§ 34, 47 ; *Union Mutual* v.
*The Commercial Mutual, Law Reporter,* March 1856, *p.*
610.

Under these circumstances, a policy drawn up and
signed ·by the proper officers wants no further delivery.
It is a vital policy as soon as signed, becomes instantly

the property of the insured, and is held by the insurer for his use. *Ang. on Fire Ins.*, §§ 33, 31 ; *Pim* v. *Reed*, 6 *Man. & Grang.* 1 ; *Kohne* v. *Ins. Co.*, 1 *Wash. C. C. R.* 93.

But here were further acts of delivery of the policy. It was, on the 13th of March, mailed, and sent to Breck, to deliver to the plaintiff. This was sending it to the plaintiff by Breck. Breck and the mail were only the vehicles to carry it to him. It was the same thing as if mailed or sent directly to the plaintiff. The defendants suggest, in answer, that Breck was their agent, and that, by sending it to him, they did not part with the possession of the policy, and that they only gave authority to Breck to deliver, which they could and did revoke before actual delivery. But when they mailed the policy to Breck to deliver, they did not constitute him their agent, to receive or keep it for them, nor to retain it as their agent. He was, in that regard, no agent of theirs ; he had nothing further to do for them. By sending him the policy to deliver, they made Breck trustee for the plaintiff; they made it a deposit with Breck to the credit of the plaintiff. It was a delivery to Breck to deliver to the plaintiff, which was a good delivery to the plaintiff. *Shep. Touch.* 58. This is not a question of the authority or acts of an agent; but whether the defendants, by sending the policy to Breck to deliver, did an overt act intended to signify that the policy should have a present vitality. This, certainly, was such an act. Without any further interference on their part, it would have resulted in actual delivery to the plaintiff. It was intended to signify to the plaintiff not only that the policy was a present contract, but to effect an actual delivery of it to him. *Kentucky Mutual Ins. Co.* v. *Jenks*, 5 *Porter* (*Ind.*) *R.* 96; 5 *Barr* 339 ; 9 *How.* 390.

Suppose the defendants had retained the policy, and had merely told Breck to tell the plaintiff that they held the policy subject to the plaintiff's order, would they not have been deemed as holding the policy for the plaintiff?

The defendants next suggest that the plaintiff was igno-

rant of their acceptance of the risk, of their making out and mailing the policy to Breck until after they had countermanded its delivery, and that the *aggregatio mentium* could not take place until after the acceptance of the proposition by the defendants came to the plaintiff's knowledge, and that before that, the defendants had changed their own minds, so that in fact it never did take place, and that consequently there was no legal delivery of this policy.

This involves the more general question, does a contract arise when an overt act is done, intended to signify the acceptance of a specific proposition, or not until that overt act comes to the knowledge of the proposer? This question may arise upon every mode of negotiating a contract, whether the parties be in each other's presence or not. First comes the mental resolve to accept the proposition; but the law can only recognize an overt act. Whether that act be a word spoken, a telegraphic sign, or a letter mailed, some interval of time, more or less appreciable, must intervene between the doing of the act and its coming to the knowledge of the party to whom it is addressed. In the meantime, what is the condition of affairs? Is it a contract or no contract? If the bidder does not see the auctioneer's hammer fall; if the article written for and sent never arrives; if the verbal answer, when the parties are in each other's presence, is in a foreign tongue, or by sudden noise or distraction is not heard; if the telegraphic circuit is broken; if the mail miscarries; if the word spoken or the letter sent is overtaken, and countermanded by the electric current, is there no contract? In the progress of the negotiation, at what precise point of time does mind meet mind, does the contract spring into life?

Upon this subject, with respect to negotiations conducted by written communications, there has been some variety of decision, but it appears to me that the weight

Hallock v. Insurance Co.

of authority, as well as reason and necessity, admit of but one solution.

The meeting of two minds, the *aggregatio mentium* necessary to the constitution of every contract, must take place *eo instanti* with the doing of any overt act intended to signify to the other party the acceptance of the proposition, without regard to when that act comes to the knowledge of the other party; everything else must be question of proof or of the binding force of the contract by matters subsequent. The overt act may be as various as the form and nature of contracts. It may be by the fall of the hammer, by words spoken, by letter, by telegraph, by remitting the article sent for, by mutual signing or by delivery of the paper, and the delivery may be by any act intended to signify that the instrument shall have a present vitality. Whatever the form, the act done is the irrevocable evidence of the *aggregatio mentium;* at that instant the bargain is struck. The acceptor can no more overtake and countermand by telegraph, his letter mailed, than he can his words of acceptance after they have issued from his lips on their way to the hearer. If the two minds do not meet *eo instanti* with the act signifying acceptance, when can they, in the nature of things, ever approach each other more closely? The defendants say, when the act of acceptance comes to the knowledge of the other party. But this knowledge would be a fact without any force, unless we suppose in the proposer a power still of electing not to accept the acceptance. But if we do this, it is apparent that the negotiation is yet precisely in the same stage of development it was in when the first proposition was waiting upon the first answer. The notion that there is no contract until the acceptance comes to the knowledge of the other party, proceeds upon the ground, in the first place, that the proposal has been withdrawn or lost its force, which is against the intent of the parties and the necessities of the case; and in the second place, upon the ground that the answer is condi-

tional, whereas we suppose it to be absolute. We suppose the acceptor to say not simply I agree, but to say I agree if you do, which requires an answer from the proposer; so that the minds do not meet till he answers. But in the meantime the acceptor may have changed his mind, and for the same reason as before, there is no bargain until this last answer comes to the knowledge of the other party; and so, upon this theory, it must go on *ad infinitum* without the possibility of the *aggregatio mentium* ever taking place. There is in fact no difference between the acceptance of a proposition by word of mouth and a letter stating an acceptance. It the one case it is articulate sounds carried by the air, in the other, written signs carried by the mail or by telegraph. The vital question is, was the intention manifested by any overt act, not by what kind of messenger it was sent. The bargain, if ever struck at all, must be *eo instanti* with such overt act. Mailing a letter containing an acceptance, or the instrument itself intended for the other party, is certainly such an act. *Adams* v. *Lindsell*, 1 *Barn. & Ald.* 681; *Dunlop* v. *Higgins*, 1 *House of Lords Cases* 381; *Duncan* v. *Topham*, 8 *C. B.* 225; *Potter* v. *Saunders*, 6 *Hare* 1; *Tayloe* v. *Merchants' Ins. Co.*, 9 *How.* 390; *Hamilton* v. *Lycoming Ins. Co.*, 5 *Barr* 339; *Vassar* v. *Camp*, 14 *Barb.* 341; *Mactier* v. *Frith*, 6 *Wend.* 103; *Kentucky Mutual* v. *Jenks*, 5 *Porter's* (*Ind.*) *R.* 96. This last case, in all its essential features, is identical with the one before us.

The only English case sustaining the defendants in their view, that I have seen, is that of *Cooke* v. *Oxley*, 3 *Term R.* 653, which it will be preceived, by the above references, has been effectually overruled in their courts.

In the State of New York, the case of *Mactier* v. *Frith*, 1 *Paige* 434, was reversed in their Court of Errors by a very large vote (6 *Wend.* 111), and the doctrine sustained as contended for by the plaintiff.

The only other American case on this side of the question is that of *McCulloch* v. *The Eagle Ins. Co.*, 1 *Pick.*

278. This last is against the whole current of authorities both in England and in this country, and, appears to me, requires for the creation of a contract a fact without significance, or a condition that would render its creation impossible.

Let judgment be entered on the verdict for the plaintiff.

POTTS, J. I concur in the opinion that the plaintiff is entitled to judgment upon the verdict in this case. The contract of insurance was complete when the company executed the policy and forwarded it to their agent at Bath, to be delivered to the plaintiff. The agent was authorized by the defendants to make surveys, receive proposals for insurance, and to receive premiums upon risks accepted by the company. The plaintiff applied to him for an insurance of $1200 on his buildings, and, being informed the premium would be $24, he offered him the premium, and the agent said he would consider it as paid, but would leave it with the plaintiff, who was a banker, and with whom he, the agent, kept an account, till the policy arrived, when he would call and get the money. The agent states expressly that he considered the money on deposit. The plaintiff had, therefore, done everything on his part which was to be done. The premium being under the control and subject to the check of the agent, must be considered as paid to the company the moment the policy was issued. It is very much like the case of *The N. Y. Central Ins. Co.* v. *National Protection Ins. Co.*, 20 *Barb.* 474.

Then the acceptance of the proposal to insure for the premium offered was the completion of the negotiation, and after the policy had been executed and forwarded by mail to the agent for delivery, the contract could not be rescinded without the consent of the insured party. The cases of *Tayloe* v. *Merchants Fire Ins. Co.*, 9 *How.* 400, and *Mactier* v. *Frith*, 6 *Wend.* 115, are authorities for this.

There is no pretence here of any misrepresentation, concealment, or fraud on the part of the plaintiff. The fact that, when the company actually executed the policy, the buildings had been destroyed by fire, is no defence. The company chose to take a risk that was retrospective as well as prospective. They contracted, on the 13th, to insure the buildings from the 10th of March. They intended to include the risk from the 10th to the 13th, as well as the future risk. No other possible construction can be given to the contract, without altering its terms, and that the court cannot do. There is nothing illegal or contrary to public policy in this. Though both the contract and policy are subsequent to the destruction of the property, the insurers may be bound.    12 *Wheaton* 408, *General Int. Ins. Co.* v. *Ruggles* ; 23 *Wendell* 24, *Lightbody* v. *North. Am. Ins. Co.*    Where there is nothing to impugn the honesty of the transaction, courts are bound to give effect to the intention of the parties when that intention is clearly expressed in the contract they enter into.

The CHIEF JUSTICE concurred.

AFFIRMED, 3 *Dutch.* 645.    *Cited in Potts* v. *Whitehead*, 5 *C. E. Gr.* 59 ; *Ins. Co.* v. *Folsom*, 18 *Wall.* 251.